**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PATRICE JAMES, | |
| Plaintiff, | 3:19 Civ. 13690 |
| -v.- | **MEMORANDUM OPINION** |
| ROBERT VORNLOCKER, JR., *et al.*, | |
| Defendants. | |

CHERYL ANN KRAUSE, Circuit Judge, sitting by designation.

Plaintiff Patrice James bought two lots and built a house in Franklin Township, located in Somerset, New Jersey, but after years of construction trouble, failed inspections, and disputes with Township officials, banks foreclosed on her house and land. James sued the Township, as well as Township officials Robert Vornlocker, Vincent Lupo, Carl Hauck, Richard Carabelli, and Louis N. Rainone, alleging violations of various federal and state laws relating to alleged discrimination and taking of property. Defendants now move for summary judgment. For the reasons detailed below, the Court will grant Defendants' motion.

**BACKGROUND**[1]

**A.      Factual Background**

Prior to outlining the pertinent facts in this matter, the Court must first briefly address which facts are undisputed on this record. Local Civil Rule 56.1(a) provides that

---

[1] The facts recounted here are drawn from Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Def. 56.1" (Dkt #38-6)); Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Pl. 56.1" (Dkt. #39)); Plaintiff's

1

opponents of summary judgment must furnish "a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, *stating each material fact in dispute and citing to the affidavits and other documents* submitted in connection with the motion[.]"  Local Civil Rule 56.1(a) (emphasis added).  Thus, where a fact stated in a movant's Rule 56.1 Statement is supported by evidence, the Court finds such fact to be true where the non-movant merely denies it: (1) with a conclusory statement, (2) without evidentiary support, or (3) with the recitation of additional facts but without actually contesting the asserted proposition.  *See, e.g.*, *Marsh v. GGB, LLC*, 455 F. Supp. 3d 113, 119 n.2 (D.N.J. 2020); *V.C. ex rel. Costello v. Target Corp.*, 454 F. Supp. 3d 415, 419 n.4 (D.N.J. 2020); *Read v. Profeta*, 397 F. Supp. 3d 597, 612 n.3 (D.N.J. 2019); *Barker v. Our Lady of Mount Carmel Sch.*, 2016 WL 4571388, at *1 n.1 (D.N.J. Sep. 1, 2016).

---

Supplemental Statements of Disputed Material Facts ("Pl. Supp. 56.1" (Dkt. #39)); the exhibits attached to Plaintiff's brief in opposition to summary judgment (Pl. Opp., Ex. [ ] (Dkt. #39-1)); the Certification of Steven K. Parness in Support of Defendants' Motion for Summary Judgment and the exhibits attached thereto ("Parness Decl., Ex. [ ]" (Dkt. #38-2, 38-3)); and the Certification of Vincent Lupo in Support of Defendants' Motion for Summary Judgment and the exhibits attached thereto ("Lupo Decl., Ex. [ ]" (Dkt. #38-4, 38-5)).

　　　For ease of reference, the Court will refer to Defendants' brief in support of their motion for summary judgment as "Def. Br." (Dkt. #38-7); Plaintiff's brief in opposition as "Pl. Opp." (Dkt. #39); and Defendants' reply brief as "Def. Reply" (Dkt. #40). Plaintiff's First Amended Complaint, which is the operative pleading in this litigation, will be referenced as the "Amended Complaint" or "FAC."  (Parness Decl., Ex. A). Because the Amended Complaint does not contain consecutively numbered paragraphs, citations are to page numbers.

In her Rule 56.1 statement, Plaintiff admits all but 23 statements in Defendants'

176-paragraph submission.  (*See generally* Pl. 56.1).  And where Plaintiff does dispute a

statement, her 23 objections merely consist of a conclusory declaration that Defendants'

conduct was improper, add extraneous facts without actually contesting Defendants'

statement, or advance legal conclusions disguised as statements of fact.[2]  (Pl. 56.1 ¶¶ 6–7,

11, 34, 40, 44, 46, 63, 73–77, 146, 148, 150–52, 155, 164, 167, 169–70).  *See, e.g., V.C.*,

454 F. Supp. 3d at 419 n.4; *Read*, 397 F. Supp. 3d at 612 n.3; *accord Ill. Nat'l Ins. Co. v.*

*Wyndham Worldwide Ops., Inc.*, 85 F. Supp. 3d 785, 792 (D.N.J. 2015) ("Statements that

'blur[ ] the line between fact and opinion' and include 'arguments cloaked as undisputed

facts' are improper under [Local] Rule [56.1] and will not be considered by the court."

---

[2] By way of illustration, in objecting to Paragraphs 150–52 and 155, which describe an incident where Plaintiff used a check that she subsequently cancelled to try to pay a fine, Plaintiff's objections do not dispute any of the facts alleged regarding the use of the cancelled check; instead she simply adds an additional "fact": stating—without any record support—that she had already paid the fine prior to the events described in the disputed paragraphs.  (*Compare* Def. 56.1 ¶¶ 150–52, 155, *with* Pl. 56.1 ¶¶ 150–52, 155). As another example, Paragraphs 73–77 describe an incident where Defendant Carl Hauck told Plaintiff that she was required to put dry wells on her property due to a wetlands issue, and that she could do the work herself or pay the Township to put in the wells. Plaintiff does not dispute Defendants' assertion that Hauck relayed this information to her; rather she conclusively asserts, again without record support, that Hauck's insistence that she was required to install dry wells was itself untrue.  (*Compare* Def. 56.1 ¶¶ 73–77, *with* Pl. 56.1 ¶¶ 73–77).  As a third illustrative example, Paragraph 34 quotes Plaintiff's deposition testimony "that [her] accumulated debt 'was due to the two years of paying extra construction mortgage that was unnecessarily created because [she] could not get the CO [certificate of occupancy].'"  (Def. 56.1 ¶ 34 (quoting Parness Decl., Ex. B at 57:4–7 ("James Dep."))).  Plaintiff objects that "she was unable to obtain the CO due to the targeting of blacks and wom[e]n exhibited by the Defendants that Plaintiff was not deserving of such property.  Plaintiff was repeatedly and unlawfully denied the same due to her race and sex[,]" thus offering an unsupported legal conclusion that, even if true, would not conflict with the statement that her debt was due to a failure to secure a CO. (Pl. 56.1 ¶ 34).

(quoting *N.J. Auto. Ins. Plan v. Sciarra*, 103 F. Supp. 2d 388, 395 n.4 (D.N.J. 1998)).

Furthermore, for 20 of her 23 objections, Plaintiff fails to support her contentions with

"affidavits [or] other documents submitted in connection with the motion[.]" Local Civil

Rule 56.1(a). (Pl. 56.1 ¶¶ 6–7, 11, 34, 40, 44, 46, 63, 75–77, 146, 148, 150–52, 155, 167,

169–70).[3]

As such, even where Plaintiff objects to Defendants' Rule 56.1 statements, she

fails to create a dispute. Accordingly, the Court deems Defendants' statements to be

undisputed, but nevertheless notes objections below where appropriate. *See* Local Civil

Rule 56.1(a); *see also Read*, 397 F. Supp. 3d at 611, 612 n.3; *Barker*, 2016 WL 4571388,

at *1 n.1. And because a failure to dispute a statement of material facts "is not alone a

sufficient basis for the entry of a summary judgment," the Court independently reviews

the record to ensure Defendants have carried their burden of proof under Federal Rule of

Civil Procedure 56(e). *Anchorage Assocs. v. V.I. Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d

Cir. 1990).[4]

---

[3] In the three paragraphs where Plaintiff does provide record support for her objections, she nevertheless fails to create any disputed issue of material fact because her objections either add additional facts without disputing Defendants' proffered facts (*see* Pl. 56.1 ¶¶ 73–74), or advance legal conclusions masquerading as fact (*see id.* at ¶ 164).

[4] Local Rule 56.1 further requires that "each statement of material facts shall be a separate document (not part of a brief)," but Plaintiff filed her Rule 56.1 statement in her brief. Despite this failure to comply with the Local Rules, the Court will exercise its discretion to consider her Rule 56.1 statement.

### 1.     The Parties

Plaintiff identifies herself as a black woman who is a principal property manager for the Port Authority of New York and New Jersey.  (Def. 56.1 ¶ 4; James Dep. 12:5–7, 121:12–13).  In 2007, she bought land in Franklin Township on which she built a home.  (Def. 56.1 ¶¶ 1–3).  After experiencing financial and construction trouble, and difficulties satisfying various local and state regulations, Plaintiff sued Franklin Township, as well as Township Manager Robert Vornlocker, Construction Manager Vincent Lupo, Public Works Engineer Carl Hauck, Tax Assessor Richard Carabelli, and Township Attorney Louis N. Rainone (the "Individual Defendants," and collectively with Franklin Township, "Defendants"), alleging race and sex discrimination in connection with various disputes over Plaintiff's property.  (*See* FAC 4–14).[5]

### 2.     Plaintiff's Construction Difficulties

In 2007, Plaintiff bought two adjacent lots in Franklin Township with plans to subdivide the property into three lots and build houses on each of the lots.  (Def. 56.1 ¶¶ 1–2).  The claims in this litigation arise from difficulties surrounding the construction of—and subsequent dispute over obtaining a certificate of occupancy ("CO") for—the first of these houses, where Plaintiff has lived since its construction.  (*See id.* at ¶¶ 3, 6–7; *see also* FAC 3–4).

---

[5] Plaintiff also named as defendants Sherita A. Whitestone and Keith Jones, two employees of the State of New Jersey.  (*See generally* FAC).  Plaintiff subsequently voluntarily dismissed Whitestone and Jones pursuant to Federal Rule of Civil Procedure 41(a)(1)(A).  (Dkt. #29, 37).

Plaintiff's difficulties grew out of an overly ambitious construction project. Although she had no direct experience with construction or home-building, she declined to hire a construction company or general contractor for the construction of her home. (Def. 56.1 ¶¶ 56–57).  Instead, Plaintiff opted to serve as her own general contractor (*id.* at ¶¶ 56–62), consulted colleagues at the Port Authority as needed on an informal basis (*id.* at ¶¶ 63–64), and had family members do "a lot of the work" to keep the cost of construction down.  (*id.* at ¶ 14).

But for myriad reasons, Plaintiff's plan to complete the construction herself quickly ran into trouble.  For one, there were wetlands on her property, and she faced repeated delays, stop work orders, and violations arising out of her improper dumping and failure to comply with other wetlands-related requirements of the New Jersey Department of Environmental Protection ("NJDEP").  (*See* Def. 56.1 ¶¶ 65–79, 128–36, 138–41).  These requirements included putting in dry wells to handle increased runoff from the house she built—a requirement Plaintiff disputed and continues to dispute to this day—which caused a significant delay and financial outlay to resolve.  (*Id.* at ¶¶ 73–79).

For another, the construction required various building and zoning approvals that Plaintiff had difficulty securing.  For example, it took roughly two years for the Township Planning Board to approve Plaintiff's proposed subdivision and issue zoning and construction permits, because Plaintiff required seven compliance reviews to finally satisfy at least thirteen of the fourteen compliance areas.  (*See* Def. 56.1 ¶¶ 80–96).

6

Once Plaintiff secured necessary permits and approvals, she experienced further delays as a result of failed inspections and code violations.  Township records reflect that between 2010 and 2013, Plaintiff requested 127 inspections, cancelled 31 inspection requests, and failed 44 inspections.  (Def. 56.1 ¶¶ 117–19).[6]  The Township carried out approximately 70 inspections on the interior construction alone.  (*Id.* at ¶ 97).  The record is replete with documentation explaining and substantiating the numerous reasons for Plaintiff's many failed inspections, including for deficient plumbing and electrical work (*id.* at ¶ 121), failure to connect a gas pipe to the furnace (*id.* at ¶¶ 104–05), and failure to install dry wells (*id.* at ¶ 114).  (*See also id.* at ¶¶ 98–114 (detailing failed inspections); Lupo Decl., Ex. 1 (Township records regarding Plaintiff's property, including of inspections); *cf.* Lupo Decl. ¶ 7 (discussing the general procedure for creating records of and documenting inspections)).

On top of these permitting and inspection difficulties, Plaintiff also received three stop work orders, "one for a soil disturbance violation, one for a potential wetlands/soil export issue, and another one for moving soil onto an adjacent property without a permit."  (Def. 56.1 ¶ 123).  These stop work orders required the involvement of the NJDEP, as they implicated the wetlands on and adjacent to Plaintiff's property (*see id.* at ¶¶ 128–29, 133–140), and required remediation, resulting in additional delays (*see id.* at

---

[6] Plaintiff testified that she believed 50 of the 127 requests were "bogus," and she disputed the Township's contention that its records showed 44 failed inspections.  (James Dep. 70:1–19).  However, Plaintiff provides no evidence to counter Defendants' records on this point and identifies no inspection record which she believes is fabricated or inaccurate.

¶¶ 127, 132, 139–40).  In total, Plaintiff claims the stop work orders delayed her by six-to-eight months, though she testified that she continued construction even while subject to a stop work order.  (*Id.* at ¶¶ 141–42).

Despite Plaintiff's many failed inspections, stop work orders, fines, and violations, the record contains no evidence of a formal appeal of any of these adverse decisions. (Lupo Decl. ¶ 17; *see id.* at ¶¶ 11–13, 16 (detailing proper procedure for appealing stop work orders, fines, construction violations, and failed inspections).

### 3.    Plaintiff's Financial Difficulties

Plaintiff had planned to construct homes on the property she purchased and then to refinance the homes to pay off the original mortgage.  (Def. 56.1 ¶ 11).  But when she ran into trouble completing the construction quickly, she faced serious financial challenges. (*Id.* at ¶ 32).  So, over the following years, she obtained additional construction mortgages, refinanced her mortgages numerous times, obtained several private, high-interest loans, and received myriad extensions on those loan and mortgage payments. (*See id.* at ¶¶ 15–41).

To qualify for some of these loans and refinancing opportunities, Plaintiff had to shuffle ownership of the land among various people and corporate entities.  For example, Plaintiff originally had the property deeded to her Port Authority colleague (who she identifies as a "Caucasian male partner") because, at the time she bought the land, she alleges that "she was aware of specifics relating to Defendants and their racial and sexist discriminatory practices."  (Pl. 56.1 ¶ 46; *see id.* at ¶¶ 44–46.).  Later, however, in order to refinance her mortgage, she had to add herself to the deed (Def. 56.1 ¶¶ 22, 47–48),

and about a year later, to obtain additional funding, she transferred the deed to Hairouna, Inc. ("Hairouna"), a company Plaintiff formed with her brother-in-law for the purpose of obtaining construction mortgages for the property (*id.* at ¶¶ 29–31, 49–50). At a later point, she transferred the deed back to herself from Hairouna, then added her brother-in-law and then-fiancé, and then removed herself from the deed "because she needed financing and her 'credit was terrible at that point.'" (*Id.* at ¶¶ 52–54 (quoting James Dep. 55:7)). And after that, she transferred the property yet again to herself, her brother-in-law, and her new fiancé. (*Id.* at ¶ 55).

But this strategy of robbing Peter to pay Paul eventually caught up with Plaintiff, and she was unable to make payments on her various loans, ultimately causing Lanco Bank and Indymac Bank to foreclose: first, on the adjacent lots in 2014, and then on her home in 2018. (Def. 56.1 ¶¶ 38, 41; *see also id.* at ¶¶ 17, 32–41). Plaintiff testified that her accumulated debt "was due to the two years of paying extra construction mortgage that was unnecessarily created because I could not get the CO," (James Dep. 57:4–7), and claimed that had she obtained a CO earlier, she could have refinanced at a significantly lower interest rate and avoided the various fees, fines, and other financial burdens she incurred while awaiting its issuance (Def. 56.1 ¶¶ 33, 34, 36–37, 40).

### 4. Plaintiff's Certificate of Occupancy

Because Plaintiff claims that her financial difficulties were caused by the delay in obtaining a CO, her dispute with the Township over that issue is at the heart of this lawsuit. As such, the Court briefly discusses the requirements for obtaining a CO in Franklin Township, and then recounts Plaintiff's difficulties in obtaining one.

9

Defendant Vincent Lupo was the Township's Construction Manager during the relevant period, and hence the official tasked with overseeing the implementation of the Uniform Construction Code (including the CO requirement) in the Township. (Parness Decl., Ex. D at 10:8-11:6 ("Lupo Dep.")). He testified that to obtain a CO in Franklin Township, one must satisfy the requirements laid out in the New Jersey Uniform Construction Code. (*Id.* at 24:16–20). *See* N.J. Admin Code § 5:23-24. In full, the legal requirements for obtaining a CO under state law are:

1. That the completed project meets the conditions of the construction permit, and all prior approvals and has been done substantially in accordance with the code and with those portions of the plans and specifications controlled by the code;

2. That all required fees have been paid in full;

3. That all necessary inspections have been completed and that the completed project meets the requirements of the regulations;

4. That all violations have been corrected and that any assessed penalties have been paid;

5. That all protective devices and equipment required to be installed by the regulations will continue to be operational as required by the regulations.

N.J. Admin. Code § 5:23-2.24(a).[7]

---

[7] Lupo's testimony regarding the CO requirements tracks the Uniform Construction Code: he specified that obtaining a CO in Franklin Township requires that "[a]ll prior approvals have to be met. That the home has to be finished. That all subcode officials have to sign off on it. All payments that have to be made, all penalties that have to be paid, all fines have to be paid, have to be paid. That's pretty much it. It's a chapter, a section in our code." (Lupo Dep. 24:12–18).

Lupo added that there are many reasons why CO requests are denied, including failure to obtain a homeowner's warranty (Lupo Dep. 10:21–24), or "[f]or nonpayment of penalties . . . and for not meeting all prior approvals." (*Id.* at 24:25–25:1).  In particular, he explained, CO requests can be denied for failure to make "COAH [Council on Affordable Housing] payments," or to comply with conditions of approval from "engineering, Somerset [County] [s]oils, . . . [and] the Board of Health." (*Id.* at 25:2–4).  As relevant here, the NJDEP was responsible for handling wetlands issues on Plaintiff's property (Def. 56.1 ¶ 68; Hauck Dep. 18:16–25), and the homeowner's warranty requirement was imposed by the State, not the Township (Def. 56.1 ¶¶ 171, 173; *see* Lupo Dep. 10:19–24, 13:21–24).

Plaintiff first applied for a CO in February 2012, and did not ultimately receive one until September 2013, roughly 18 months later.[8]  (Def. 56.1 ¶¶ 161, 176).  Plaintiff complains that she was improperly denied a CO by Defendants, but the record reflects that over these 18 months, she failed to satisfy many of the CO requirements, including compliance with various prior approvals, payment of fees and fines, and obtaining a homeowner's warranty. (*See id.* at ¶¶ 159–76).  For example, Lupo testified that Plaintiff had "a number of issues" that prevented her from obtaining a CO over the 18-month period, including that "[t]he home wasn't finished yet, it hadn't passed all its final inspections.  It still doesn't, to this day, meet all the requirements under the Uniform

---

[8] The CO was issued to Hairouna, not to Plaintiff.  (Def. 56.1 ¶ 176).

Construction Code.  The COAH fees haven't been paid yet.  There was an outstanding

penalty due . . . .  It was quite a bit that was missing."  (Lupo Dep. 12:2–14).

In particular, Plaintiff disputed the homeowner's warranty and COAH fee

requirements, and delayed her compliance for some time due to her belief that she need

not comply with them.  (*See* Def. 56.1 ¶¶ 164, 166, 169; *see also* Pl. 56.1 ¶¶ 164, 169–

70).  Lupo testified that, because a corporation owned the home (i.e., Hairouna, not

Plaintiff), New Jersey law required that Plaintiff obtain a homeowner's warranty, and

indeed, the State of New Jersey Department of Community Affairs ("DCA") wrote to

Plaintiff and the Township informing her that Hairouna must supply a homeowner's

warranty.  (Def. 56.1 ¶¶ 167–174).  Plaintiff admitted that she knew she could not receive

her CO until she paid the COAH fee, but she refused to pay the fee until she was told

when her CO would be issued.  (*Id.* at ¶¶ 165–66; *see also* James Dep. 96:18–20 ("I have

to pay the COAH fee before I get [the CO], but you can't hold up my CO because I didn't

pay the COAH fee.").  She finally paid the COAH fee in September 2013, the same

month she received the CO.  (Def. 56.1 ¶¶ 166, 176).

## B.     Procedural Background

Plaintiff initiated this action in December 2018 in the Superior Court of New

Jersey, Chancery Division, Somerset County (*see* Dkt. #1-2), and she filed her Amended

Complaint in April 2019 (*see generally* FAC).  In June 2019, Defendants removed the

action to federal court and answered the Amended Complaint, and the parties proceeded

to discovery.  (*See* Dkt. #1, 4, 15).  After the close of fact discovery, Defendants moved

for summary judgment (*see* Dkt. #38), Plaintiff filed her opposition (Dkt. #39), and

Defendants filed a reply (Dkt. #40).  Defendants' fully briefed motion for summary judgment was reassigned to this Court in March 2022, for the limited purpose of resolving the pending motion.  (Dkt. #42).

## DISCUSSION

### A.    Applicable Law

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Bonkowski v. Oberg Indus., Inc.*, 787 F.3d 190, 195 n.1 (3d Cir. 2015).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact that supports the elements of its claims.  *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (citing *Celotex*, 477 U.S. at 322–24).  Once the moving party has met this burden, the non-moving party "must set forth specific facts showing a genuine issue for trial." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991); *see also* Fed. R. Civ. P. 56(c).  In reviewing a summary judgment motion, the Court is required to view all facts "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Curto v. A Country Place*

13

*Condo. Ass'n, Inc.*, 921 F.3d 405, 409 (3d Cir. 2019) (citation omitted).  But there are

limits:  "Unsupported assertions, conclusory allegations, or mere suspicions are

insufficient to overcome a motion for summary judgment."  *Betts v. New Castle Youth*

*Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

## B.    Analysis

Plaintiff's Amended Complaint states six counts, alleging, pursuant to 42 U.S.C.

§ 1983, violations of the Takings Clause of the U.S. Constitution ("Count 1"), the Equal

Protection Clause of the U.S. Constitution ("Count 2"); and the Due Process Clause of

the U.S. Constitution ("Count 4"); as well as claims under Title VI of the Civil Rights

Act of 1964 ("Title VI"), 42 U.S.C. § 2000d *et seq.* ("Count 3"); the New Jersey Civil

Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2 ("Count 5"); and the New Jersey Law

Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 *et seq.* ("Count 6").  (FAC

3–15).  Plaintiff alleges that construction fines, stop work orders, failed inspections, and

other delays in obtaining a CO were the result of Defendants' discrimination against her,

ultimately leading to the foreclosures.  But as discussed in greater detail below, Plaintiff

presents no evidence to support any of her conclusory allegations, and because she fails

to identify any disputed issue of material fact, the Court will grant Defendants' motion

for summary judgment.

1.      **Plaintiff's Takings and Due Process Claims Fail (Counts 1 and 4)**[9]

Plaintiff advances two theories of liability under the Fifth and Fourteenth

Amendments:  first, that Defendants violated the Takings Clause (Pl. Opp. 39–40), and

second, that Defendants' conduct denied her substantive and procedural due process (*id.*

at 40–41, 49–51).  The Court addresses each theory in turn and concludes that each lacks

merit.

a.      **There Was No Taking (Count 1)**

The Fifth Amendment's Takings Clause provides that "private property [shall not]

be taken for public use, without just compensation."  U.S. Const. amend. V.  To establish

a violation, a plaintiff must assert a "legally cognizable property interest," and then we

ask: "(1) was there a taking?; (2) was that taking for public use?; (3) did the claimant

receive just compensation?"  *Park Restoration, LLC v. Erie Ins. Exch.*, 855 F.3d 519,

525–26 (3d Cir. 2017) (quotation omitted).

Here, Plaintiff has a cognizable interest in her property, but she does not allege

"[t]he paradigmatic taking" of a physical invasion or appropriation that property.  *Lingle*

*v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005).  Instead, she contends that the delay in

---

[9] Plaintiff purports to bring some of these claims under the Fourteenth Amendment, and others under the Fifth Amendment (*see* FAC 3–7), which the Court understands to mean the Fifth Amendment, as incorporated against the states by the Fourteenth Amendment.  *See Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 151, 155 (3d Cir. 2018); *Chicago, B & Q R., Co. v. City of Chicago*, 166 U.S. 226, 241 (1897). In addition to advancing a Fifth Amendment substantive due process claim in Count 1, Plaintiff alleges a substantive due process claim under the Fourteenth Amendment in Count 4.  (*See* Pl. Opp. 49–50).  Plaintiff also asserts, in Count 4, a procedural due process claim under the Fourteenth Amendment.  (*See* Pl. Opp. 50–51.)  The Court first addresses her takings claim, and then all of her due process claims.

obtaining her CO constituted a taking by "prevent[ing] Plaintiff from obtaining new loans and having the ability to service any existing loans[, which] then led to the loss of the Vacant Lot [and house]" through foreclosure.  (Pl. Opp. 40).  Fatal to her takings claim, however, Plaintiff does not establish any connection between the alleged "taking"—*i.e.*, the foreclosures—and Defendants' actions.  The "purely private" foreclosure by third-party banks on Plaintiff's property is not state action, much less government action for public use.  *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 245 (1984); *see Gibbs v. Titelman*, 502 F.2d 1107, 1113 (3d Cir. 1974) (holding that "private repossessions are not infused with 'state action' merely because the state enacted [laws allowing for foreclosure or repossession]").

Even construing Plaintiff to allege that the state and local ordinances that establish the CO requirement effected a taking, her claim fails.  Government regulation may, "in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster," and "such 'regulatory takings' may be compensable under the Fifth Amendment," *Lingle*, 544 U.S. at 537, but Plaintiff has not established that the government action here rose to such a level.  The CO requirement was not a "per se" taking, which is caused by "a regulation [that] denies all economically beneficial or productive use of land," *Murr v. Wisconsin*, 137 S. Ct. 1933, 1937 (2017) (quotation omitted), so we evaluate Plaintiff's regulatory takings claim under the *Penn Central* framework, balancing, *inter alia*, "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action," *Nekrilov v. City*

16

*of Jersey City*,—F.4th—, 2022 WL 3366430, at *7 (3d. Cir. 2022) (quoting *Murr*, 137

S. Ct. at 1937); *see also Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124

(1978.  The application of this framework allows for flexibility, but in broad terms the

"inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's

economic impact and the degree to which it interferes with legitimate property interests."

*Nekrilov*, 2022 WL 3366430, at *7 (quoting *Lingle*, 544 U.S. at 540).

     Here, Plaintiff vaguely contends that the "regulation violations to obtain the CO

were improper, singled out the Plaintiff, and denied the Plaintiff the use of her property

as it delayed her ability to move into the property," constituting a taking.  (Pl. Opp. 40).

But she does not marshal any evidence to support these contentions, which is perhaps

because the land use regulation at issue here is a "'classic example' of [a] permissible

regulation[] that do[es] not require compensation even where [it] 'prohibit[s] the most

beneficial use of the property.'" *Nekrilov*, 2022 WL 3366430, at *10 (quoting *Penn

Central*, 438 U.S. at 125).[10]

     In fact, none of the *Penn Central* factors weigh in favor of Plaintiff.  First, the

economic impact of the CO requirement is negligible.  Obtaining a CO in Franklin

Township simply requires compliance with § 5:23-2.24 of New Jersey's Uniform

Construction Code, including that "that all prior approvals have to be met[,] the home has

---

[10] *See also, e.g.*, *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 395 (1926);
*Rogin v. Bensalem Twp.*, 616 F.2d 680, 692 (3d Cir. 1980); *Pace Resources, Inc. v.
Shrewsbury Twp.*, 808 F.2d 1023, 1031 (3d Cir. 1978); *Midnight Sessions, Ltd. v. City of
Philadelphia*, 945 F.2d 667, 678 (3d Cir. 1991), *abrogated on other grounds by United
Artists Theatre Cir., Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003).

to be finished[,] all subcode officials have to sign off on it[,] [a]ll payments that have to

be made, all penalties that have to be paid, [and] all fines have to be paid."  (Def.

56.1¶ 157).  *See also* N.J. Admin. Code § 5:23-2.24(a).  Measuring the "economic

impact" of the CO requirement "in terms of its effect on the value of the property,"

*Nekrilov*, 2022 WL 3366430, at *7, the CO requirement does not decrease or depress the

value of Plaintiff's property at all.  A person can still use the land by living there, renting

the property, selling it, or more—as long as they satisfy the basic requirements under

New Jersey law for ensuring a new home is safe and commercially marketable.  *See* N.J.

Admin. Code §§ 5:23-2.24(a), 5:23-1.3(a)(5); *accord Nekrilov*, 2022 WL 3366430, at *8

(demanding a "drastic reduction in the value of the property . . . to require

compensation," and finding no such reduction because "the properties retain[ed] multiple

economically beneficial uses" (internal quotation marks and alteration omitted)).

    Second, the CO requirement did not alter Plaintiff's investment-backed interests.

Plaintiff does not allege that these requirements were amended after she bought the

property, nor does the record establish that there was any change to the law surrounding

the CO requirement that could have "interfered with [Plaintiff's] distinct, investment-

backed expectations."  *Nekrilov*, 2022 WL 3366430, at *9.  Thus, this is not a case where

Plaintiff relied on an existing law or regulatory scheme, only to have it upended by

government action.  Accordingly, the second *Penn Central* factor favors Defendants.

    And third, the character of the Government's action is a perfectly valid exercise of

the police power, because it "bear[s] a 'substantial relation to the public health, safety,

morals, or general welfare.'"  *Rogin v. Bensalem Twp.*, 616 F.2d 680, 688 (3d Cir. 1980)

(quoting *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 395 (1926)). As the Supreme Court has "consistently affirmed[,] States have broad power to regulate housing conditions in general," *Nekrilov*, 2022 WL 3366430, at *11 (quoting *Yee v. City of Escondido*, 503 U.S. 519, 528 (1992)), and so "courts are more likely to uphold a regulation that 'applies generally to a broad class of properties,'" *id.*, at *11 (quoting *Rogin*, 616 F.2d at 690). The CO requirement is one such regulation, and therefore this *Penn Central* factor weighs against finding a taking.

In short, then, the CO requirement itself is not a "functional equivalent" to the direct appropriation of Plaintiff's property, so it does not constitute a regulatory taking. *Id.* at *12.

> **b.    Plaintiff Has Not Established a Substantive Due Process Violation (Counts 1 and 4)**

Plaintiff also characterizes her takings claim as arising under "the modern doctrine of substantive due process." (Pl. Opp. 41 (citing *Lochner v. New York*, 198 U.S. 45 (1905)). The Third Circuit has "recognized that 'two very different threads' make up 'the fabric of substantive due process': substantive due process relating to legislative action and substantive due process relating to non-legislative action." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 155 (3d Cir. 2018) (quoting *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000)). Although Plaintiff's briefing is not a paragon of clarity, the Court understands her to raise a claim under both threads.

First, to the extent Plaintiff challenges the CO requirement itself on substantive due process grounds, such an ordinance is a "legislative act[]" and so is "subjected to

rational basis review." *Nekrilov*, 2022 WL 3366430, at *13.  The CO requirement

therefore satisfies substantive due process so long as it is rationally related to a legitimate

state interest, and we ask merely "whether it was irrational for the Township to have

passed the law at all and to have applied it to [Plaintiff]."  *Rogin*, 616 F.2d at 689; *accord*

*Nekrilov*, 2022 WL 3366430, at *13 ("The City must demonstrate (1) the existence of a

legitimate state interest that (2) could be rationally furthered by the statute.") (quotation

omitted).  Here, as noted above, to obtain a CO, a property owner must satisfy the

requirements of the Uniform Construction Code, N.J. Admin. Code § 5:23-2.24(a), and

the Township has a legitimate interest in applying and enforcing the code, which aims to,

*inter alia*, "insure adequate maintenance of buildings and structures throughout the State

and [] adequately protect the health, safety and welfare of the people," *id.* § 5:23-

1.3(a)(5).  Because the CO requirements "are a rational and reasonable means to

accomplish that purpose," Plaintiff's substantive due process challenge cannot succeed.

*Rogin*, 616 F.2d at 689; *see also Nekrilov*, 2022 WL 3366430, at *14 (rejecting

substantive due process challenge to zoning ordinance where "the face of the ordinance

articulates the very state interests that the ordinance furthers").[11]

   To the extent Plaintiff may be challenging individual official actions arising out of

the application of the CO requirement—*e.g.*, the denial of a permit, issuance of a stop

---

[11] Plaintiff also challenges the requirement that a business or corporation obtain a
home warranty if it owns the property on substantive due process grounds, *see* Pl. 56.1
¶¶ 169–70, but such a requirement is also a rational and reasonable means to "protect the
health, safety and welfare of the people."  N.J. Admin. Code § 5:23-1.3(a)(5); *see also*
Lupo Dep. 12:16-21, 17:2-7.  Her challenge to this requirement on equal protection and
procedural due process grounds is discussed *infra*.

work order, imposition of a fine, or decision that she failed an inspection—she is raising

substantive due process challenges to non-legislative state action for which civil liability

arises from "only the most egregious official conduct," of the kind that "shocks the

conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *see Eichenlaub v.*

*Twp. of Indiana*, 385 F.3d 274, 285 (3d Cir. 2004).  But the conduct she highlights does

not meet that threshold.

Plaintiff contends, for example, that the 18-month delay in obtaining a CO suffices

to shock the conscience (*see* Pl. Opp. 49–50), but that delay is primarily attributable not

to any official Township action, but to Plaintiff's own reticence to pay the COAH fee and

her disagreement with the state's requirement that Hairouna obtain a homeowner's

warranty (Def. 56. 1 ¶¶ 164–76).  And Third Circuit precedent makes clear that "a normal

zoning dispute" will not satisfy the "shocks the conscience test," even where a plaintiff

advances allegations—similar to those advanced here—that "officials applied . . .

requirements to [plaintiff's] property that were not applied to other parcels; that they

pursued unannounced and unnecessary inspection and enforcement actions; that they

delayed certain permits and approvals; [and] that they improperly increased tax

assessments[.]" *Eichenlaub*, 385 F.3d at 286.

Plaintiff points to no other specific official decision as violative of substantive due

process, and the Court has not identified any particular inspection, fine, violation, or stop

work order that would shock the conscience.  Defendants, on the other hand, have

provided ample evidence to substantiate the rationale behind various official decisions

related to Plaintiff's long-running dispute with the Township over her property.  (*See*

Def. 56.1 ¶¶ 65–175; Lupo Decl., Ex. 1 (Township records for Plaintiff's property)); *see also* Lupo Decl. ¶¶ 6–17).  Plaintiff therefore fails to satisfy the "shocks the conscience" test.[12]

### c.   Plaintiff Has Not Established a Procedural Due Process Violation (Count 4)

Plaintiff also advances a conclusory procedural due process claim, arguing that Defendants failed to "prove[] or allege[] that [the denial of Plaintiff's CO] was [according to] standard procedure."  (Pl. Opp. 51).  But Plaintiff was not denied a CO; rather, it took her 18 months to satisfy the Uniform Construction Code, after which time the Township issued the CO.  (Def. 56.1 ¶¶ 161, 166, 176).  In any event, generously construing Plaintiff to allege that the cumulative process of obtaining a CO lacked constitutionally sufficient process, the claim must still be dismissed.

To analyze Plaintiff's procedural due process claim, we pursue a two-part inquiry: "(1) whether the plaintiff has a property interest protected by procedural due process, and (2) what procedures constitute 'due process of law.'"  *Schmidt v. Creedon*, 639 F.3d 587, 595 (3d Cir. 2011) (quotation omitted).  Here, the Court need not determine whether Plaintiff has a cognizable property interest in the issuance of a CO, because the record

---

[12] To the extent Plaintiff alleges that Defendants' actions constituted a taking by improperly denying her the normal process afforded to an applicant for a CO, Plaintiff is advancing a procedural due process claim.  *See Taylor Inv., Ltd. v. Upper Darby Twp.*, 983 F.2d 1285, 1293 n.14 (3d Cir. 1993).  And to the extent she alleges that Defendants unevenly applied the law to her for discriminatory reasons, such a claim is more properly treated as a selective enforcement claim, not a substantive due process claim.  *See Karns v. Shanahan*, 879 F.3d 504, 520–21 (3d Cir. 2018).  Plaintiff's procedural due process and selective enforcement claims are discussed below.

establishes that the procedure afforded Plaintiff was not constitutionally deficient in any way.  As fully articulated in Lupo's sworn certification, the Township, County, and State each provided ample process for all of the various obstacles Plaintiff encountered in attempting to obtain a CO, including for inspections (Lupo Decl. ¶¶ 7, 11), stop work orders (*id.* at ¶¶ 8, 12), and construction violations and fines (*id.* at ¶¶ 9, 13), and provided avenues for appealing all adverse decisions (*id.* at ¶¶ 11–13, 16).  Those robust procedural frameworks are more than constitutionally sufficient.  *See Rogin*, 616 F.2d at 694–95.

And Plaintiff actually received this process, as evident from the voluminous records relating to her property, which include detailed inspection reports and letters from the Township and State notifying her of decisions and her right to appeal.  (*Lupo Decl.*, Ex. 1; *see also id.* at ¶¶ 14–15 (reflecting compromise with Plaintiff to reduce fines owed by 90%); Lupo Dep. 27:14–22 (noting that the Township "tried to bend a little bit to be able to get [Plaintiff] in" to her house and issued the CO despite Plaintiff's failure to fully satisfy all requirements)).  Yet Plaintiff never appealed any adverse decision. (*Lupo Decl.* at ¶ 17); *Accord Parratt v. Taylor*, 451 U.S. 527, 543–44 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986) (holding that a prisoner deprived of materials in prison by state employee could not state a due process claim if the State provided adequate post-deprivation process which the plaintiff failed to utilize).

Because Plaintiff received constitutionally adequate process, the Court will also grant summary judgment to Defendants on her procedural due process claim.

\* \* \*

23

In advancing her takings and due process claims, Plaintiff points only to the straightforward application of garden variety local and state land use regulations as violative of her Constitutional rights. The Court declines Plaintiff's invitation to "convert[] federal courts into super zoning tribunals," *Eichenlaub*, 385 F.3d at 285, and will therefore grant summary judgment to Defendants on Counts 1 and 4.

### 2.    Plaintiff's Equal Protection Claims Cannot Proceed (Counts 2 and 5)

Plaintiff brings an equal protection claim, pursuant to 42 U.S.C. § 1983, alleging a violation of the United States Constitution, as well as a corresponding equal protection claim under the NJCRA, N.J. Stat. Ann. § 10:6-2, alleging a violation of the New Jersey Constitution.[13] Plaintiff offers no evidence of unequal treatment and so Counts 2 and 5 will be dismissed.

To establish a claim under § 1983, "a plaintiff must plead [1] a deprivation of a constitutional right and [2] that the constitutional deprivation was caused by a person acting under the color of state law." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008). The Court understands Plaintiff to allege an equal protection claim based on

---

[13] The NJCRA was modeled after § 1983, and, thus, courts in New Jersey have consistently examined claims under the NJCRA "through the lens of § 1983." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443–44 (D.N.J. 2011) (collecting cases); *see also Lepping v. Cnty. of Mercer*, No. 18-cv-2118, 2018 WL 5263281, at *9 (D.N.J. Oct. 23, 2018) (construing New Jersey equal protection claims asserted under NJCRA analogously to § 1983 equal protection claims); *Chapman v. New Jersey*, Civ. No. 08-cv-4130, 2009 WL 2634888, *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart[.]"); *Armstrong v. Sherman,* No. 09-cv-716, 2010 WL 2483911, *5 (D.N.J. June 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983[.]"). Accordingly, Plaintiff's New Jersey State Constitution claim is analyzed analogously to her § 1983 equal protection claim. *Accord Trafton*, 799 F. Supp. 2d at 443–44.

the selective enforcement of the Township regulations because she contends that Defendants required her to obtain a home warranty when they did not require others to do so.  (Pl. Opp. 42–44).  For her selective enforcement claim to succeed, Plaintiff must demonstrate "(1) that [she] was treated differently from other similarly situated individuals; and (2) that this selective treatment was based on an unjustifiable standard, such as race, religion, some other arbitrary factor or to prevent the exercise of a fundamental right."  *Karns v. Shanahan*, 879 F.3d 504, 520–21 (3d Cir. 2018) (footnote omitted).

Here, Plaintiff claims she was treated differently on the basis of her race and sex, (Pl. Opp. 43), but she neither establishes that she was treated differently from similarly situated individuals, nor puts forward "evidence of discriminatory purpose," in that race or sex played a role in Defendants' actions, *Jewish Home of E. Pa. v. Ctrs. for Medicare & Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012).  For example, Plaintiff "do[es] not even identify other individuals who might be similarly situated," *Karns*, 879 F.3d at 521, much less comparators who are alike "in all relevant aspects," *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008).  As such, Plaintiff "point[s] to no evidence that [Defendants] treated similarly situated individuals differently," *Karns*, 879 F.3d at 521, and so fails to create a disputed issue of material fact as to differential treatment.

She also fails to raise a triable issue as to discriminatory purpose.  The record establishes (and Plaintiff concedes) that at the time Plaintiff sought her CO, Hairouna, a corporation, owned the home.  (Def. 56.1 ¶ 169).  Because the home was owned by a

corporation, New Jersey law required Hairouna to obtain a homeowner's warranty (*id.* at ¶¶ 167, 169–70, 173), even if Plaintiff did not intend to sell it (*see* Pl. Opp. 43–44). Defendants communicated that requirement to Plaintiff repeatedly, and the DCA wrote to Plaintiff and the Township confirming that Hairouna must obtain a homeowner's warranty.  (Def. 56.1 ¶¶ 168–69, 171, 174).  Thus, there is no evidence that Defendants required Plaintiff to obtain the warranty for discriminatory reasons.[14]

Plaintiff also advances an equal protection claim against the Township under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as well as a Section 1983 conspiracy claim against the Individual Defendants.  (Pl. Opp. 43–47).  But, for the reasons provided above, Plaintiff provides no evidence of a constitutional violation, much less that any violation was due to a discriminatory Township policy, and so these claims also falter.  *See C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005) ("To impose [Monell] liability . . . under § 1983, Plaintiffs must show a 'relevant policy or custom, and that the policy caused the constitutional violation alleged.'" (alterations

---

[14] Although Plaintiff identifies no record support whatsoever connecting Defendants' actions to her race and/or sex, the Court independently reviewed the record to ensure Defendants have carried their burden under Fed. R. Civ. P. 56.  The record contains one non-conclusory allegation that the Court could identify.  Plaintiff, citing to her own unsubstantiated interrogatory response, claims that in a 2013 meeting, Lupo told her that "that he had 'run an investigation on [Plaintiff]' and was 'concerned' about where Plaintiff was getting her money to build her home."  (Pl. Supp. 56.1 ¶ 27). Plaintiff never broached this topic with Lupo at his deposition (*see generally* Lupo Dep.), nor does it give rise to an inference that the comment bears on her race or sex, given Lupo's knowledge of Plaintiff's financial and construction troubles up to that point (*see, e.g.*, Def. 56.1 ¶ 105, 169).  But even accepting Plaintiff's attenuated allegation as true, it fails to create a disputed issue of material fact because Plaintiff cannot identify similarly situated individuals, nor has she connected this comment to the State's requirement that Hairouna, as a corporation that owned the home, obtain a homeowner's warranty.

omitted) (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583–84 (3d Cir.

2003)).  Similarly, Plaintiff's conspiracy claim falls short because she adduces no

evidence of a conspiracy "to deprive any person of constitutional rights."  *Jutrowski v.*

*Twnp. of Riverdale*, 904 F.3d 280, 294 n.15 (3d Cir. 2018) (alterations omitted) (quoting

*Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001).[15]

### 3.       Plaintiff's Title VI Claim Lacks Merit (Count 3)

Plaintiff alleges that Defendants violated Title VI of the Civil Rights Act of 1964

by "singl[ing] out and target[ing] Plaintiff" with "threats, harassment[,] and vested

governmental powers [to] effectuate exorbitant violations" against the Plaintiff because

of her race and sex.  (FAC 9).  Title VI provides, in relevant part, that "[n]o person in the

United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  To

establish a damages claim under Title VI, as Plaintiff attempts here, a litigant must "show

that the defendant engaged in intentional discrimination."  *Blunt v. Lower Merion Sch.*

*Dist.*, 767 F.3d 247, 272 (3d Cir. 2014).  But for the reasons discussed above, there is no

evidence of discrimination—intentional or otherwise—in the record.  Summary judgment

therefore will go to Defendants on this claim as well.

---

[15] Because Plaintiff's equal protection claims fail on the merits, the Court need not
address Defendants' invocation of a qualified immunity defense.

27

### 4.     Plaintiff's NJLAD Claim Must Be Remanded (Count 6)

Plaintiff's claim under the NJLAD must be remanded for lack of jurisdiction. Under N.J. Stat. Ann. § 10:5-12.5(a), it is unlawful for a municipality "to exercise the power to regulate land use or housing in a manner that discriminates" on the basis of, *inter alia*, race and sex.  However, unlike claims brought under other provisions of the NJLAD, which are routinely resolved in federal courts, claims brought under § 10:5-12.5 "may only be enforced by initiating an action in [New Jersey] Superior Court[.]"  § 10:5-12.5(b).  The plain text of § 10:5-12.5(b) thus precludes federal courts from enforcing claims brought pursuant to § 10:5-12.5(a), and courts in this District have consistently interpreted § 10:5-12.5(b) as a bar to subject matter jurisdiction over § 10:5-12.5(a) claims in federal court.  *See, e.g.*, *Hansen Found., Inc. v. City of Atlantic City*, 504 F. Supp. 3d 327, 342 (D.N.J. 2020) (collecting cases); *Kessler Inst. for Rehab., Inc. v. Mayor of Essex Fells*, 876 F. Supp. 641, 664–65 (D.N.J. 1995).  The Court will therefore remand Plaintiff's NJLAD claim for lack of subject matter jurisdiction.  *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."); *Hansen*, 504 F. Supp. 3d at 342; *accord Bromwell v. Mich. Mut. Ins. Co.*, 115 F.3d 208, 213 (3d Cir.1997) (holding that "when a federal court has no jurisdiction of a case removed from a state court, it must remand [pursuant to § 1447(c)] and not dismiss on the ground of futility").

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment will be granted with respect to Counts 1–5, and the Court will remand Count 6 for lack of subject matter jurisdiction.

The Court will enter an Order consistent with this Memorandum Opinion.

Dated:   August 31, 2022

_____
CHERYL ANN KRAUSE
United States Circuit Judge